# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

**JEFFREY M. SISKIND, individually**
**and derivatively on behalf of**
**EINSTEIN CLINICAL LABORATORIES, SA,**

**07-61131**

Plaintiffs,

**CIV-HURLEY**   **ZHOPKINS**

vs.

FILED by ___ D.C.
INTAKE

**STEPHEN VINCENT, GEORGE EINSTEIN,**
**and INVERSIONES FLOR DE INVIERNO, SA,**

AUG 1 0 2007

Defendants.

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. • FT. LAUD.

_____/

## COMPLAINT IN CIVIL ACTION:

AND NOW come the Plaintiffs, Jeffrey M. Siskind ("Siskind") individually and derivatively on behalf of Einstein Clinical Laboratories, SA ("ECL" or the "Company"), by their undersigned counsel, and file the following Complaint against the Defendants named herein, and allege as follows.

### NATURE OF THE ACTION:

1.      This Complaint is brought by Siskind both individually and as a shareholder of ECL on behalf of the Company against George Einstein, a shareholder of ECL ("Einstein"), Stephen Vincent ("Vincent"), and Inversiones Flor De Invierno, SA ("Inversiones"), seeking to remedy Defendants' violations of patent infringement in violation of the Patent Laws of the United States, 35 U.S.C. § 1 et seq.; and for related and other claims under the laws of the State of Florida, including derivative claims for breach of fiduciary duty, theft of corporate assets, unjust enrichment, and for other common law claims against George Einstein, Stephen Vincent, and Inversiones Flor De

1

Invierno, SA for conspiracy, breach of contract, intentional interference with contractual relations, a demand for indemnification for Plaintiffs' attorney's fees and costs, as well as equitable relief in the form of an injunction, all of which have caused substantial losses to Siskind individually and to ECL.

## THE PARTIES:

2.      The Plaintiff, Siskind, is an adult individual with a business address of 525 S. Flagler Drive, Suite 200, West Palm Beach, Florida 33401.

3.      The Defendant Stephen Vincent is an individual resident of the State of Florida with an address of 100 Fig Tree Lane, Plantation, Fl 33317.

4.      ECL is a corporation formed in the Dominican Republic with its principal office in the United States first located at 375 S. County Road, Suite 201, Palm Beach, Florida and now maintains an office at One North Charles Street, Suite 2310, Baltimore, Md 21201.

5.      The Defendant Einstein is, upon information and belief, an individual resident of Woodlands, Texas.

6.      The Defendant Inversiones is, upon information and belief, a corporation formed in the Dominican Republic with an address of Sarasota Avenue at the corner of Francisco Moreno Street, Plaza Kury, Suite 302, Santo Domingo, Dominican Republic.

## JURISDICTION AND VENUE:

7.      This Court has jurisdiction under 28 U.S.C. §§ 1331, 1338(a) and (b), and 2201 as it involves substantial claims arising under the Patent Laws of the United States, the Declaratory Judgment Act, as well as principles of supplementary jurisdiction under 28 U.S.C. § 1367.

2

8.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391 and 1400. All Defendants reside in, can be found in, have agents in and/or transact or have transacted affairs in this District.

## FACTUAL ALLEGATIONS:

9.    Upon information and belief, Einstein is a professor, holder of a doctorate degree in business and an inventor.

10.    ECL has spent substantial sums of money developing an invention called a "blood irradiating apparatus" that disinfects blood through controlled exposure to an ultraviolet light source (the "apparatus").

11.    According to Einstein, the apparatus makes it possible to destroy germs, viruses, bacteria, and eliminate a variety of toxins and pathogens in the blood. As a result of treatment utilizing this invention, according to Einstein, the apparatus will significantly reduce the viral load of persons infected with the HIV and Hepatitis C viruses.

12.    On November 18, 2000, Einstein and other investors formed ECL. The corporation intended to conduct research utilizing the blood irradiating apparatus. Einstein represented to these other investors that he was the grandson of Albert Einstein. Based upon Einstein's representations, these investors invested several hundred thousand dollars in ECL. This assertion was later discovered to be false.

13.    On November 22, 2001, Einstein executed an Assignment Agreement with ECL in which Einstein granted, conveyed, sold, and assigned all his rights and title to a number of assets including:

> ... all intellectual property in any way connected or related to the development of the blood irradiation machines or its technology, all

3

provisional and permanent patents previously or hereafter issued or obtained to protect the rights to the property acquired by ECL and research information used in the development of the machines and the protocol for treatments in the use of these machines and equipment to eradicate viral and other infection(s) of the blood.

A true and correct copy of the Assignment Agreement is attached hereto and marked as Exhibit "A".

14.     In consideration for the assignment of the intellectual property, ECL agreed to sell to Einstein 350,000 shares of its stock at a purchase price of $2.50 per share for a total price of $875,000. The transfer of the intellectual property was valued at $460,000. This amount was credited to the total stock purchase price thereby leaving a balance owed by Einstein of $415,000.

15.     During the time of the Assignment Agreement, Einstein was an officer and director of ECL as well as a substantial shareholder.

16.     During the time of the Assignment Agreement, other individuals including the Plaintiff Siskind invested substantial sums of money in ECL and became shareholders.

17.     On April 17, 2002, ECL filed an application for a United States Patent for the blood irradiating apparatus.

18.     On October 4, 2005, the United States Patent Office issued a patent for the blood irradiating apparatus that was designated as patent number 6,951,548 B1. The patent correctly noted ECL as the assignee of the patent. A true and correct copy of the patent is attached hereto and marked as Exhibit "B".

19.     Since the date of the assignment until the present, substantial sums of money and time have been expended by ECL to further develop the blood irradiating

4

apparatus. Further, substantial sums of money and time have been expended in promoting the establishment of clinics in which to further test, refine and develop the apparatus.

20.    According to Einstein, ECL successfully treated a women, who was infected with the Hepatitis C virus.

21.    The treatment of this women was done through the invitation of the Minister of Health for the Republic of the Sudan Government. ECL was further advised by the government of Sudan that if the treatment of this women was successful, the government of Sudan would provide substantial funding to ECL to establish clinics in Sudan which clinics would result in substantial profits to ECL.

22.    ECL has received overtures from the Presidents of Tchad and Gabone to establish clinics in these two African countries to treat HIV infected children for which the government of Tchad has been, by grants from the United States, allocated $44 million dollars in funding. Again, the establishment of treatment protocols in these countries would result in substantial profits to ECL.

23.    ECL, under Einstein's direction, also expended substantial sums of money promoting the establishment of a treatment protocol using the apparatus including the development and formulation of a world wide web page. Under Einstein's direction, this included the publication of information concerning the treatment protocol on the internet.

24.    The attorney general of the state of Florida learned that the Company made unsubstantiated claims on its internet website which were prohibited by Florida law. Einstein was fined $1,000 and immediately resigned his position as an officer of ECL.

25.    On or about July 28, 2007, Plaintiffs became aware that Einstein in his

individual capacity executed a transfer agreement dated May 29, 2007 in which Einstein sold the intellectual property rights to the apparatus and all his shares in ECL to Inversiones pursuant to a transfer agreement. A true and correct copy of the transfer agreement which was drafted in Spanish and a true and correct English translation are attached hereto as Exhibits "C" and "D".

26.     The transfer agreement provided, among other things, for the payment to Einstein of $30,000 plus the additional payment of 50% of the profits from the apparatus.

27.     Upon information and belief, the formulation, funding, and impetus for the transfer agreement was provided by Vincent. It is also believed and therefore averred that Vincent directly or indirectly controls the actions of Inversiones.

28.     Vincent, Inversiones, and Einstein had specific knowledge of the grant and issuance of the patent by the United States Patent Office to ECL.

29.     Notwithstanding the aforesaid knowledge and indeed by reason of such knowledge, each of the Defendants, upon information and belief, have set upon a scheme and course of conduct to misappropriate ECL's patent rights and intellectual property and to deceive the public into believing that the apparatus belongs to the Defendants instead of to ECL.

30.     Upon information and belief, the Defendants are continuing to develop the apparatus and are selling and offering to sell its services to the public with the specific intent of profiting from the apparatus at the expense and detriment to ECL.

31.     These actions are part of a larger scheme orchestrated by Vincent to harm Plaintiff's reputation and steal from the Plaintiff and his family shares of stock in companies worth millions of dollars, in which scheme Einstein is cooperating, either

intentionally or unwittingly.  Ironically, prior to implementing this scheme, Vincent first undertook to have ECL's research efforts determined to be illegal.

## DUTIES OF EINSTEIN

32.    By reason of his positions as a substantial shareholder, former officer, inventor and fiduciary of the Company, Einstein owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and was and is required to act in a fair, just, honest and equitable manner. In addition, Einstein was and is required to act in furtherance of the best interests of the Company and its shareholders in order to benefit all shareholders equally and not in furtherance of his own personal interests or benefit.

33.    Einstein as a substantial shareholder and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the use and preservation of its property and assets, and the highest obligations of fair dealing.

34.    To discharge his duties, Einstein as a shareholder and officer of the Company was required to exercise reasonable and prudent actions with respect to his dealings with the Company including, among other things:

> (a) refraining from enriching himself at the expense of the Company and the shareholders of the Company;
>
> (b) avoid wasting the Company's assets, and to maximize the value of the Company; and
>
> (c) refrain from selling Company assets to others without the consent of the Company.

35.    Einstein, by virtue of his positions as a shareholder and officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the

exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of Einstein complained of herein involves a knowing and culpable violation of his obligations as a shareholder and officer of the Company, the absence of good faith on his part, and a reckless disregard for his duties to the Company and its shareholders that Einstein was aware or should have been aware posed a risk of serious injury to the Company and its shareholders.

36.     Einstein's actions have irreparably damaged the value of the Company and irreparably harmed the Company's ability to continue to operate.

### DERIVATIVE ALLEGATIONS

37.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered by the Company as a direct result of the breaches of fiduciary duty, waste of corporate assets, fraud and unjust enrichment. The Company is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

38.     Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights.

39.     Plaintiff is and was an owner of the stock of the Company during times relevant to Einstein's wrongful course of conduct alleged herein, and remains a significant shareholder of the Company.

40.     On July 9, 2007, Plaintiff made a demand upon the Company's Board of Directors pursuant to Fla. Stat. Ann. §607.07401, to commence legal action on behalf of the Company against the Defendants herein. A true and correct copy of this letter is

attached hereto as Exhibit "E". Plaintiff demanded that the Board commence legal action against Einstein for his breach of fiduciary duty set forth herein by virtue of his diversion of corporate assets, and to further initiate action against the other Defendants named herein to recoup the lost profits and assets wrongfully taken. The particular demands made upon the Board are detailed in the demand.

41.    On July 15, 2007, the Plaintiff received notice from the Board that it would not take any action against Einstein or any of the other Defendants named herein.

42.    Accordingly, Plaintiff's demand letter has been refused by the Board and this action must proceed as a derivative action under Fla. Stat. Ann. §607.07401 to redress the damages caused to the Company.

43.    All conditions precedent to the maintenance of this action have been performed or have occurred.

### FIRST CAUSE OF ACTION
### Against All Defendants for Infringement of
### United States Patent No.: 6,951,548 B1

44.    Plaintiffs incorporate the preceding paragraphs as though fully set forth at length.

45.    ECL has a validly issued patent from the United States Patent Office.

46.    Each of the Defendants knew that a patent had been issued by the United States and that it had been assigned to and was owned by ECL.

47.    Each of the Defendants have infringed upon ECL's patent and continues to infringe on each of the claims of the patent by their development, use, and marketing of the patent.

48.    Upon information and belief, the Defendants have actively induced and

9

currently are actively inducing others to infringe on ECL's patent through the development, use, marketing, and offer for sale of the services through the patent.

49. Upon information and belief, the Defendants have contributorily infringed and currently are contributorily infringing ECL's patent through the development, use, and marketing of the patent.

50. The Defendants infringement, inducement of infringement, and contributory infringement of ECL's patent have been and continue to be willful.

51. As a direct and proximate result of the Defendants' conduct complained of herein, ECL has suffered, continues to suffer, and will suffer substantial injury, including irreparable injury, and will result in damages to ECL including loss of sales and profits which ECL would have made but for the infringement by the Defendants, unless the Defendants are enjoined by this Court.

52. ECL has no adequate remedy at law.

WHEREFORE, the Plaintiff, Einstein Clinical Laboratories, SA demands judgment in its favor and against each of the Defendants, jointly and severally, as follows:

A. That a judgment be entered that each of the Defendants named herein have infringed, actively induced others to infringe, and/or have contributorily infringed United States Patent No. 6,951,548 B1;

B. That each of the Defendants named herein, their agents, sales representatives, distributors, servants and employees, attorneys, affiliates, subsidiaries, successors and assigns, and any and all persons or entities acting at, through, under or in active concert or in participation with any or all of them, be enjoined and restrained

preliminarily during the pendency of this action, and thereafter permanently, from infringing, actively inducing others to infringe, and/or contributorily infringing United States Patent No. 6,951,548 B1;

C.      That a judgment be entered that each of the Defendants, jointly and severally be required to pay over to ECL all damages sustained by ECL due to such patent infringement and that such damages be trebled pursuant to 35 U.S.C. § 284 for the willful acts of infringement complained of herein;

D.      That in view of the Defendants' wanton and deliberate illegal acts, ECL be awarded punitive damages;

E.      That this case be adjudged and decreed exceptional under the 35 U.S.C. § 285 entitling ECL to an award of its reasonable attorney fees and costs and that such reasonable attorney fees be awarded;

F.      That ECL be awarded its costs and prejudgment interest on all damages; and

G.      That ECL be awarded such other and further relief as the Court deems just and equitable.

## SECOND CAUSE OF ACTION
### Against All Defendants for a Declaratory Judgment

53.     Plaintiffs incorporate by reference the preceding paragraphs as though fully set forth at length herein.

54.     Controversies have arisen between the Plaintiffs and the Defendants, which are actual and justiciable within the Declaratory Judgment Act, 28 U.S.C. § 2201, relating to a declaratory judgment as to the legal rights of the parties hereto.

55.     As set forth herein, ECL was the owner of the patent issued by the United States Patent Office. As also set forth herein, in blatant disregard of the ownership of this patent, Einstein sold the patent to Inversiones who has wrongfully claimed ownership of the patent.

56.     From the date of the issuance of the patent, ECL has been the sole owner and proprietor of all the rights, title and interest in and to the patent.

57.     From the date of the issuance of the patent, ECL has never sold, assigned, or in any way transferred or alienated its rights to the patent.

58.     The Defendants have wrongfully asserted ownership claims to the patent and intellectual property without any agreement with the rightful owner of the patent and intellectual property.

59.     Plaintiffs require a determination from this Court that the transfer agreement between Einstein and Inversiones is invalid and that Inversiones has no right, title, nor interest in the patent or intellectual property.

WHEREFORE, the Plaintiffs respectfully request this Honorable Court to enter an Order declaring:

A.     That pursuant to the United States Patent laws, the sole and exclusive owner of the patent is ECL;

B.     That the transfer agreement does not transfer the patent or intellectual property to Inversiones and that portion of the transfer agreement is held invalid;

C.     That the Defendants have no ownership, patent claims, or legal or equitable ownership or claims to the patent or intellectual property;

D.   That the Defendants are required to pay the Plaintiffs the costs of this lawsuit and reasonable attorney's fees; and

E.   Such other and further relief as this Court deems just and proper.

## THIRD CAUSE OF ACTION
### Against Einstein for Breach of Fiduciary Duty

60.   Plaintiffs incorporate by reference the preceding paragraphs as though fully set forth at length herein.

61.   Einstein owed and owes the Company fiduciary obligations of good faith, fair dealing, loyalty and due care.

62.   Einstein violated and breached his fiduciary duties of care, loyalty, and good faith by selling Company assets including the apparatus and other intellectual property constituting the material assets of the Company.

63.   As a direct and proximate result of Einstein's breach of his fiduciary duties, the Company has sustained significant damages. As a result of the misconduct alleged herein, Einstein is liable to the Company.

64.   The breach of fiduciary duties by Einstein was intentional, willful and malicious, and was made with the intent to defraud the Plaintiffs or with reckless disregard for the harm it would cause thus entitling Plaintiffs to an award of punitive damages.

65.   Plaintiff on behalf of the Company has no adequate remedy at law.

WHEREFORE, Plaintiffs demand judgment in their favor and against Einstein for the damages sustained, plus punitive damages, interest and costs.

13

## FOURTH CAUSE OF ACTION
### Against Einstein for Unjust Enrichment

66.     Plaintiffs incorporate by reference the preceding paragraphs as though fully set forth herein.

67.     By his wrongful acts and omissions, Einstein was unjustly enriched at the expense of and to the detriment of the Company, and it would be inequitable to allow Einstein to retain the benefits he received.

68.     Plaintiff, as a shareholder and representative of the Company, seeks restitution from Einstein and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by Einstein, from his wrongful conduct and fiduciary breaches.

WHEREFORE, Plaintiffs demand judgment in their favor and against Einstein and demand an order directing Einstein to disgorge all profits, benefits, and other compensation obtained by Einstein from the transfer agreement, plus interest and costs.

## FIFTH CAUSE OF ACTION
### Against Einstein for Theft of Corporate Assets

69.     Plaintiffs incorporate the preceding paragraphs as though fully set forth at length herein.

70.     Einstein was fully aware of the validly issued patent on the apparatus and was also fully aware that all the rights to the apparatus including the patent, machines, and other intellectual property had been sold and assigned by him to the Company.

71.     Einstein stole the Company's property and sold this property to the other Defendants named herein.

72.     Einstein's theft of the Company's sole assets has devastated the Company

14

and will make it impossible for the Company to continue in business.

73. As a direct and proximate result of Einstein's theft, the Plaintiffs have been deprived of property that belonged to them and have sustained substantial damages in the form of lost profits which the Plaintiffs would have otherwise earned.

74. The theft of the Plaintiffs' property by Einstein and the resulting damage to the Company was intentional, willful, malicious, and was made to cause harm to the Plaintiffs thus entitling the Plaintiffs to an award of punitive damages.

WHEREFORE, the Plaintiffs demand judgment in their favor and against the Defendant Einstein in an amount of damages sustained, together with punitive damages, costs, interest, and attorney's fees.

## SIXTH CAUSE OF ACTION
### Against Defendants for Breach of Contract

75. Plaintiffs incorporate the preceding paragraphs as though fully set forth at length herein.

76. In the Assignment Agreement, Einstein subscribed for and agreed to purchase 350,000 shares of the stock of ECL at a purchase price of $2.50 per share for a total purchase price of $875,000. Einstein was credited towards the purchase price of the stock the sum of $460,000 representing the then estimated value of the intellectual property including the apparatus that Einstein sold and assigned to the Company. Following the sale of the intellectual property, Einstein had a remaining balance owed under the contract for the stock purchase of $415,000.

77. As of the date of this Complaint, Einstein has failed to pay the remaining balance owed ECL for his stock purchase.

15

78.     By virtue of the transfer agreement between Einstein and Inversions, Einstein sold his stock in ECL.

79.     Inversions is subject to the liabilities under the Assignment Agreement between Einstein and ECL by virtue of the transfer agreement and stock purchase.

80.     By failing to pay the remaining $415,000 due for the stock purchased, Inversions is in breach of contract and the Plaintiffs have sustained damages in the amount of $415,000.

81.     Upon information and belief, Vincent is the true architect of the illegal transfer agreement and is the real party in interest in Inversions. Therefore, Vincent is liable for said damages.

WHEREFORE, the Plaintiffs demand judgment in their favor and against Einstein, Inversions and Vincent, jointly and severally, in the amount of $415,000 plus interest and costs.

**SEVENTH CAUSE OF ACTION**
**Against Inversiones and Vincent**
**for Intentional Interference With Contractual Relations**

82.     Plaintiffs incorporate the preceding paragraphs as though fully set forth at length herein.

83.     The Defendants, Inversiones and Vincent knew or should have known of the contractual relations between Einstein and ECL regarding the sale and assignment of the intellectual property rights to ECL and the assignment of the patent to ECL.

84.     These Defendants intentionally, tortuously, improperly and without justification or privilege, wrongfully interfered with the Plaintiffs' contractual relations between Einstein and ECL by inducing Einstein into breaching his contractual relations

with the Plaintiffs and by transferring the intellectual property rights to these Defendants.

85.     As a direct and proximate result of these Defendants interference with the contractual relations set forth herein, the Plaintiffs have incurred damages in the nature of lost marketing costs, lost time, and lost profits they would have earned from the intellectual property.

86.     The foregoing conduct of these Defendants was willful, intentional and malicious, and was done with the knowledge or with reckless disregard that Einstein would breach his contractual relations with the Plaintiffs, thereby entitling the Plaintiffs to an award of punitive damages.

WHEREFORE, the Plaintiffs demand judgment in their favor and against the Defendants Inversiones and Vincent, jointly and severally, for their damages sustained together with punitive damages, costs, interest and attorney's fees.

## EIGHTH CAUSE OF ACTION
### Against All Defendants for Civil Conspiracy

87.     Plaintiffs incorporate the preceding paragraphs as though fully set forth at length herein.

88.     Each of the Defendants herein knew that the Company owned the patent and other intellectual property relating to the apparatus.

89.     In spite of the Defendants' knowledge of the ownership of the patent and intellectual property of the Plaintiffs, there was an overt agreement between each of the Defendants to act in concert with one another to engage in the unlawful act of infringing upon Plaintiffs' validly issued patent and the further unlawful act of misappropriating the patent and the other intellectual property for the Defendants own use, benefit, and profit.

17

90.     The overt act described herein was done by these Defendants pursuant to the Defendants' conspiracy and agreement to infringe and misappropriate Plaintiffs' patent and intellectual property to their own use and benefit.

91.     The overt act in furtherance of the Defendants' conspiracy was unlawful and continues to be unlawful to this day.

92.     As a direct and proximate result of the Defendants' conspiracy, the Plaintiffs have incurred damages in the form of marketing costs, time, and lost profits.

93.     The foregoing conduct of these Defendants was willful, intentional and malicious, and was done with the knowledge or with reckless disregard for the harm it would cause Plaintiffs, thereby entitling the Plaintiffs to an award of punitive damages.

WHEREFORE, the Plaintiffs demand judgment in their favor and against the Defendants, jointly and severally for their damages sustained together with punitive damages, costs, interest and attorney's fees.

## NINTH CAUSE OF ACTION
### Against Einstein for Indemnification of Attorney's Fees and Costs

94.     Plaintiffs incorporate the preceding paragraphs as though fully set forth at length herein.

95.     As set forth herein, Einstein executed an Assignment Agreement with ECL on November 22, 2001 in which Einstein sold and assigned all his rights to the intellectual property including the apparatus to ECL.

96.     Einstein agreed in the Assignment Agreement to indemnify ECL, and its officers and employees from any liability, loss or damage suffered as a result of any claims to the intellectual property he sold to ECL.

97.     Because Einstein sold the intellectual property to the other defendants herein, the Plaintiffs have been forced to initiate this action to defend itself and its ownership of the intellectual property rights.

98.     The Plaintiffs thereby demand Einstein pay for all of Plaintiffs' attorney's fees and costs under the indemnification.

WHEREFORE, the Plaintiffs demand judgment in their favor and against Einstein in the full amount of all attorney's fees and costs they will incur in this action.

## TENTH CAUSE OF ACTION
### Against Vincent for Piercing the Corporate Veil

99.     Plaintiffs incorporate the preceding paragraphs as though fully set forth at length herein.

100.    The Plaintiffs believe and therefore aver that Vincent, either directly or through an agent or controlled entity, is a significant owner of Inversiones.

101.    The corporate form of the corporate Inversiones is an artifice and a sham whereby Vincent used the corporation for his own personal interests and disregarded corporate formalities and avoided legal obligations.

102.    The initial capitalization of the corporate Defendant Inversiones was so thin or non-existent that there was insufficient money to meet the reasonably anticipated needs of the corporate Defendant including the money owed to the Plaintiffs as a result of the Plaintiff's claims set forth herein against Inversiones.

103.    The corporate veil of the corporate Defendant Inversiones should be disregarded and Vincent should be held personally liable for the matters complained of herein.

WHEREFORE, the Plaintiffs demand judgment in their favor and against the Defendant Steven Vincent, in an amount of the damages sustained by the Plaintiffs, plus punitive damages, costs, interest, and attorney's fees.

## JURY TRIAL DEMAND:

The Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted,

DATED: August 7th, 2007

Jeffrey M. Siskind, Esquire, *Pro Se*

LAW OFFICES of JEFFREY M. SISKIND
Trump Plaza Office Center
525 S. Flagler Drive, Suite 200
West Palm Beach, Fl 33401
Telephone: (561) 832-7720
Facsimile: (561) 832-7668
E-Mail: jeffsiskind@msn.com

By: _____
     Jeffrey M. Siskind, Esquire
     FBN 138746

# EXHIBIT A

## ASSIGNMENT

Agreement made this 2-2 —d day of November, 2001 between GEORGE EINSTEIN ("Einstein") and EINSTEIN CLINICAL LABORATORIES, S.A. ("ECL"), entered into pursuant to and in accordance with the Corporate Resolutions passed at the Second Organizational meeting of shareholders of ECL which was held on June 1, 2001 at 375 South County Road, Palm Beach, Florida, as follows:

WHEREAS, it was agreed that Einstein shall receive a credit of $450,000.00 towards payment by Einstein for 350,000 shares of ECL stock in consideration for assignment by Einstein of all of Einstein's rights and ownership in the below described machines and equipment, including in addition thereto all intellectual property however related thereto, records and other documents of every nature including all research, development, and patents, permanent or provisional, now or hereafter obtained and pertaining to the development and use of blood irradiation machines, and

WHEREAS, said assets shall immediately be used in clinical trials and other treatments for patients infected by HIV Hepatitis C, and other viral and/or bacterial infections of the blood in ECL's clinic in Santo Domingo, Dominican Republic, and elsewhere by ECL and/or others by subsequent license and/or assignment granted by ECL, and

WHEREAS, Einstein warrants that he is the sole and exclusive owner of all right, title and interest to same, except as to rights previously obtained by ECL, and is possessed of power and authority to so assign said property, and shall indemnify, defend and hold harmless ECL, its officers and employees, from any liability, loss or damages suffered as a result of valid claims to rights to same by others,

NOW, THEREFORE, by these presents and in consideration of the above and other good and valuable considerations, Einstein does hereby grant, assign, and convey all rights and title to the following machines and equipment to ECL:

| Description | Serial Number |
|---|---|
| EMC 2001 E | 000 04 4111 |
| EMC 2001 E | 000 04 4112 |
| Computer and Monitor | 000 04 4115 |
| Computer and Monitor | 000 04 4116 |
| Frequency Unit 2 | 000 04 4117 |
| EMC 2000 E | 000 04 4118 |

together with exclusive right, title, and interest in the above-described equipment and the exclusive right to duplicate and use similar machines and equipment in the future and together with all intellectual property in any way connected or related to the development of the blood irradiation machines or its technology; all provisional and permanent patents previously or hereafter issued or obtained to protect the rights to the property acquired by ECL and all research information used in

the development of the machines and the protocol for treatments in the use of these machines and equipment to eradicate viral and other infection(s) of the blood.

The parties hereto agree to keep strictly confidential and to refrain from disclosing information pertaining to this agreement, any information related thereto, said physical and/or intellectual property, all of which shall be considered proprietary in nature, the rights to which are hereby acknowledged to be owned exclusively by ECL, except as permitted by ECL, which permission shall be evidenced by a writing signed by at least three(3) officers of ECL.

This agreement contains the entire understanding between the parties, and replaces any prior oral or written representations. Disputes arising under same shall eb governed by the law of the State of Florida.

EINSTEIN CLINICAL LABORATORIES, S.A.

George Einstein

By: _____
William L. Siskind

LICDO. PAULINO DUARTE
LEGALIZATION

I, LICDO. PAULINO DUARTE Notary Public of the National District, CERTIFY that the above signatures were voluntarily placed before me by George Einstein and William L. Siskind, who state these are the signatures they use in all acts of their public and private life. In faith of which I expedite the present certification, in the City of Santo Domingo, Dominican Republic, this _22_ day of _November_, year 2001.

LICDO. PAULINO DUARTE
Notary Public

# EXHIBIT B



The United States of America

### The Director of the United States Patent and Trademark Office

*Has received an application for a patent for a new and useful invention. The title and description of the invention are enclosed. The requirements of law have been complied with, and it has been determined that a patent on the invention shall be granted under the law.*

*Therefore, this*

## United States Patent

*Grants to the person(s) having title to this patent the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States of America or importing the invention into the United States of America for the term set forth below, subject to the payment of maintenance fees as provided by law.*

*If this application was filed prior to June 8, 1995, the term of this patent is the longer of seventeen years from the date of grant of this patent or twenty years from the earliest effective U.S. filing date of the application, subject to any statutory extension.*

*If this application was filed on or after June 8, 1995, the term of this patent is twenty years from the U.S. filing date, subject to any statutory extension. If the application contains a specific reference to an earlier filed application or applications under 35 U.S.C. 120, 121 or 365(c), the term of the patent is twenty years from the date on which the earliest application was filed, subject to any statutory extensions.*

*Director of the United States Patent and Trademark Office*

US006951548B1

(12) **United States Patent**    (10) **Patent No.:**    **US 6,951,548 B1**

Einstein    (45) **Date of Patent:**    **Oct. 4, 2005**

(54) **BLOOD IRRADIATING APPARATUS**

(75) Inventor: **George Einstein**, Palm Beach, FL (US)

(73) Assignee: **Einstein Clinical Laboratories S.A.**, Palm Beach, FL (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 319 days.

(21) Appl. No.: **10/124,517**

(22) Filed: **Apr. 17, 2002**

(51) Int. Cl.[7] ........................ **A61M 37/00**; A61M 1/36; A61L 9/00; C02F 1/44

(52) U.S. Cl. ........................ **604/6.08**; 604/20; 604/27; 422/44; 422/24; 210/645

(58) Field of Search ............................ 604/4.01, 5.01, 604/6.01, 6.09, 5.04, 6.08, 20, 27; 600/9; 210/205, 645; 422/44, 24, 28

(56) **References Cited**

U.S. PATENT DOCUMENTS

2,308,516 A    1/1943   Knott

| | | | |
|---|---|---|---|
| 4,578,056 A | * | 3/1986 | King et al. ................ 604/6.08 |
| 5,433,738 A | | 7/1995 | Stinson |
| 6,113,566 A | | 9/2000 | Schleicher |
| 6,312,593 B1 | | 11/2001 | Petrie |

* cited by examiner

*Primary Examiner*—Angela D Sykes
*Assistant Examiner*—Leslie R. Deak
(74) *Attorney, Agent, or Firm*—Gold & Rizvi, P.A.; H. John Rizvi; Glenn E. Gold

(57)    **ABSTRACT**

A blood irradiating apparatus is provided including a plurality of irradiating chambers having a base and an openable cover. Each irradiating chamber will include a number of ultraviolet light bulbs configured to provide a wide spectrum of ultraviolet light of differing wavelengths. A number of cuvettes permeable to ultraviolet light will be disposed in the irradiating chamber and configured to permit blood to flow in a turbulent manner sufficient to maximize exposure to ultraviolet light. An adaptable tubing structure will be provided to strategically transport blood through a number of cuvettes for exposure to ultraviolet light during treatment.

**14 Claims, 9 Drawing Sheets**



*FIG. 1*



Case 0:07-cv-61131-DTKH   Document 1   Entered on FLSD Docket 08/10/2007   Page 28 of 49

# FIG. 2





# FIG. 7





FIG 8

Case 0: Patent-61131-DTKH   Document 1   Entered on FLSD Docket 08/10/2007   Page 32 of 49



*FIG 9*

Case 0:07-cv-61151-DTKH   Document 1   Entered on FLSD Docket 08/10/2007   Page 33 of 49

# FIG.10





*FIG. 11*

*FIG. 12*

**1**

## BLOOD IRRADIATING APPARATUS

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates generally to disinfecting blood, and more particularly to an apparatus configured to irradiate blood by controlled exposure to an ultraviolet light source.

2. Description of the Prior Art

Subjecting blood to ultraviolet light irradiation has been known to kill and eliminate a host of bacterial infections, germs, viruses, and other harmful pathogens and toxins from the body. In undergoing ultraviolet light irradiation treatment, the blood is typically removed from a patient's circulatory system and exposed to an ultraviolet light source before being reintroduced into the patient's body.

A number of devices have been developed, in the past, in an attempt to properly expose germs, bacteria, and other pathogens present in blood plasma to ultraviolet light irradiation. Existing irradiation systems, however, have not been successful in providing a broad level of flexibility in the duration of treatment or the range and intensity of ultraviolet light irradiation provided. As a result, existing treatments using irradiation therapy have generally been limited in scope to a narrow spectrum of ultraviolet light and have been quite restrictive in the combinations of irradiation duration and intensity provided. The limited flexibility provided by existing systems regarding the time and intensity of treatment often results in blood plasma that is untreated or under treated for various ailments. Additionally, existing blood irradiation systems provide very limited, if any, flexibility in the amount of turbulence provided to the blood during treatment and do not provide a practical and efficient way to strategically vary the wide range of other treatment parameters including, for example, the flow velocity or flow path that the blood will be exposed to during treatment.

Accordingly, there is an established need for a practical blood irradiating apparatus solving the aforementioned problems and providing for strategically controlled treatment of blood capable of providing variable light intensity and duration during treatment as well as flexible and controlled blood flow turbulence.

### SUMMARY OF THE INVENTION

The present invention is directed to a blood irradiating apparatus configured to irradiate blood by controlled and strategic exposure to ultraviolet light of varying wavelength and intensity.

An object of the present invention is to provide a blood irradiating apparatus that is capable of destroying germs, viruses, bacteria and eliminating a variety of toxins in the blood.

A further object of the present invention is to provide a blood irradiating apparatus capable of focusing ultraviolet light strategically within a narrow spectrum, as desired, to treat and irradiate specific varieties of germs, bacteria, or viruses in the blood.

Yet another object of the present invention is to provide a blood irradiating apparatus that is capable o irradiating a wide variety of different pathogens and combinations of toxins in the blood.

A further object of the present invention is to provide a blood irradiating apparatus that is capable of irradiating blood using a varying spectrum of ultraviolet light.

**2**

Another object of the present invention is to provide a blood irradiating apparatus that wherein the time and intensity of blood irradiation is variable.

An additional object of the present invention is to provide a blood irradiating apparatus that is capable of permitting laminar blood flow through a variety of cuvettes.

Another object of the present invention is to provide a blood irradiating apparatus capable of irradiating blood through a number of cuvettes having varying configurations.

An additional object of the present invention is to provide a blood irradiating apparatus wherein the blood can be strategically exposed to varying levels of turbulence during treatment.

In accordance with a first aspect of the invention, a blood irradiating apparatus is provided including a plurality of irradiating chambers having a base and an openable cover. Each irradiating chamber will include a number of ultraviolet light bulbs configured to provide a wide spectrum of ultraviolet light of differing wavelengths. A number of cuvettes permeable to ultraviolet light will be disposed in the irradiating chamber and configured to permit blood to flow in a turbulent manner sufficient to maximize exposure to ultraviolet light.

These and other objects, features, and advantages of the present invention will become more readily apparent from the attached drawings and the detailed description of the preferred embodiments, which follow.

### BRIEF DESCRIPTION OF THE DRAWINGS

The preferred embodiments of the invention will hereinafter be described in conjunction with the appended drawings provided to illustrate and not to limit the invention, where like designations denote like elements, and in which:

FIG. 1 is a perspective view of the blood irradiating apparatus shown without the cuvettes in place and with the irradiating chamber in an open configuration;

FIG. 2 is a perspective view of the blood irradiating apparatus shown with the cuvettes positioned and connected and with the irradiating chamber in an open configuration;

FIG. 3 is a top view of the laminar-flow cuvette for use in the blood irradiating apparatus shown in accordance with an exemplary embodiment of the present invention;

FIG. 4 is a cross-sectional view of the laminar-flow cuvette of FIG. 3 taken along line 4—4;

FIG. 5 is a top view of a cascade-flow cuvette for use in the blood irradiating apparatus shown in accordance with an exemplary embodiment of the present invention;

FIG. 6 is a cross-sectional view of the cascade-flow cuvette of FIG. 5 taken along line 6—6;

FIG. 7 is a perspective close-up view of the cascade-flow cuvette of the present invention;

FIG. 8 is a perspective exploded view of the cascade-flow cuvette of the present invention along with various components before assembly;

FIG. 9 is a schematic view showing the blood irradiating apparatus in accordance with an exemplary embodiment of the present invention;

FIG. 10 is a side view showing the irradiating chamber of the present invention in accordance with an exemplary embodiment of the present invention;

FIG. 11 is a front view showing the ultraviolet light bulb of the present invention in accordance with an exemplary embodiment of the present invention; and

FIG. 12 is a side view showing the ultraviolet light bulb of the present invention in accordance with an exemplary embodiment of the present invention.

US 6,951,548 B1

3

Like reference numerals refer to like parts throughout the several views of the drawings.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Shown throughout the figures, the present invention is generally directed towards a blood irradiating apparatus configured to disinfect blood by controlled treatment with ultraviolet light. The blood irradiating apparatus of the present invention provides the capability of strategically focusing the intensity of ultraviolet light within a narrow spectrum to irradiate specific bacteria or viruses as desired. Along with controlling the wavelength of ultraviolet light utilized during irradiation, the blood irradiating apparatus of the present invention provides the ability to strategically control the blood flow turbulence and duration of exposure to provide substantially enhanced blood treatment capabilities.

An illustrative embodiment of the blood irradiating apparatus 10 of the present invention is shown in FIGS. 1 and 2. Although the blood irradiating apparatus 10 of the present invention may be structured in a wide variety of configurations, in the preferred embodiment it will be a free-standing central unit 80 as shown. The blood irradiating apparatus 10 of the present invention will preferably have a number of irradiating chambers 20 disposed within the central unit 80 and configured to receive blood. Each irradiating chamber 20 will preferably include a cover 22 and a base 24 as best illustrated in FIGS. 1 and 2. The cover 22 and base 24 may be configured, if desired, in a generally hinged relationship to permit easy access to the interior of the irradiating chamber 20 as shown. Additionally, it will be appreciated that the irradiating chambers 20 may be configured to slide outwards to provide easy and convenient access as shown in FIGS. 1 and 2. A wide variety of known means may be utilized to facilitate such outward movement of the irradiating chamber 20. In the preferred embodiment, a conventional drawer mount 25 and cooperating mounting hardware 26 will be utilized as shown.

The blood irradiating apparatus 10 of the present invention is configured for use with a number of laminar-flow and cascade-flow cuvettes 200, 300 as best shown in FIGS. 3–8. These cuvettes 200,300 are configured to be assembled in place with a tubing structure 50 as shown in FIGS. 2 and 9 and are structured to maximize exposure of blood to ultraviolet light. Both the cascade-flow cuvette 200 and the laminar-flow cuvette 300 will be described in more detail herein.

The blood irradiating apparatus 10 of the present invention is shown in FIG. 1 without the cuvettes 200, 300 in place in order to clearly depict details of the irradiating chamber 20. As shown in FIG. 1, the cover 22 and base 24 of the irradiating chamber 20 will preferably be configured with a number of openings 28 therein to permit ultraviolet light to pass through. The base 24 of the irradiating chamber 20 may also include a number of laminar-flow cuvette holders 30 to secure the laminar-flow cuvettes during irradiation. In the preferred embodiment, at least one cascade-flow cuvette holder 32 will also be provided to secure the cascade-flow cuvette 300 during irradiation as shown in FIGS. 1 and 2.

A side view of the irradiating chamber 20 of the blood irradiating apparatus 10 is shown in FIG. 10. As shown, the cover 22 and the base 24 enclose a number of ultraviolet light bulbs 40 disposed therein. The ultraviolet light bulbs can be secured with a mounting bracket 42 as shown. As

4

discussed, the cover 22 of the irradiating chamber 20 will preferably be configured in a generally hinged relationship so that it can rotate to permit easy access to the interior of the irradiating chamber 20. The cover 22 is shown with hidden lines in an open position.

Each ultraviolet light bulb 40 will preferably be configured to provide a different intensity and wavelength of ultraviolet light for irradiating a variety of viral and bacterial diseases. As such, it will be possible to treat blood with a wide spectrum of ultraviolet light, as desired, to more thoroughly irradiate and treat blood for different purposes depending upon the specific health condition of a patient. The ultraviolet light bulb 40 of the present invention may be structured in any of a wide variety of configurations without departing from the present invention. In a most preferred embodiment, the ultraviolet light bulb 40 will be structured in a space-saving flat configuration as illustrated in the side view of FIG. 12. FIG. 11 shows a front view of an exemplary embodiment of the ultraviolet light bulb 40 of the present invention. In a most preferred embodiment, the ultraviolet light bulb 40 of the present invention will be configured with conventional terminals 48 to facilitate convenient replacement of the ultraviolet light bulbs as needed.

As previously discussed, the cover 22 and base 24 of the irradiating chamber 20 will preferably be configured with a number of openings 28 disposed therein to permit the ultraviolet light to pass to the cuvettes 200, 300. If desired, the opening 28 may be provided with a translucent covering. In a most preferred embodiment, a glass plate 36 may be positioned over the opening 28 and secured in place as shown in FIG. 10. As shown in FIG. 1, a vertically disposed ultraviolet light bulb 44 will also be utilized in the preferred embodiment as shown. The vertically disposed ultraviolet light bulb 44 will be configured to irradiate blood flowing through the cascade-flow cuvette 300 as will be described in more detail herein. In order to accommodate the cascade-flow cuvette 300 and the vertically disposed ultraviolet light bulb 44, the cover 22 of the irradiating chamber 20 may be formed with a pocket 46 therein to partially surround the ultraviolet light bulb 44, cascade-flow cuvette 300, and cascade-flow cuvette holder 32 as best shown in FIG. 1.

The blood irradiating apparatus 10 of the present invention will be particularly configured to permit blood to be treated utilizing any of a wide variety of ultraviolet light sources of differing intensity and wavelength. As best shown in the schematic view of FIG. 9, the blood irradiating apparatus 10 of the present invention is preferably configured with conduit means configured to direct blood through specific cuvettes 200, 300 as desired. In the preferred embodiment, the conduit means will comprise an adaptable tubing structure 50 as shown in FIG. 9. The adaptable tubing structure 50 will be configured to transport blood through specific cuvettes 200, 300 and permit a user to carefully control the intensity and wavelength that the blood will be exposed to. It will be appreciated that the tubing structure 50 shown is exemplary in nature and any of a wide variety of other conduit means may be utilized without departing from the present invention. If desired, a variety of valves 52 may be included in the tubing structure to facilitate strategic flow of the blood throughout the irradiating chamber 20 of the blood irradiating apparatus 10 of the present invention. As shown in FIG. 9, the blood irradiating apparatus will also preferably include an untreated blood holding tank 60 and a treated blood holding tank 62 as best shown in FIG. 9. The untreated blood will preferably flow through the irradiating chamber 20 for treatment via tubing structure 50 and cuvettes 200, 300 and exit to the treated blood storage tank

5

62 for storage after ultraviolet light exposure. In order to facilitate blood movement throughout the blood irradiating apparatus 10 of the present invention, a conventional pump 66 may be provided as shown in FIGS. 1 and 2.

The blood irradiating apparatus 10 of the present invention, as shown in FIGS. 1 and 2, may include a conventional processor 70 having a keyboard 72 and a monitor 74 as shown. The processor 70 may be used to monitor any of a variety of different parameters during blood irradiation. For example, the processor 70 may be configured to monitor the velocity of blood flow, temperature of the blood during irradiation, ultraviolet bulb intensity, blood irradiation time, and a host of other variables, as desired, during irradiation. Additionally, the blood irradiating apparatus 10 of the present invention may include, if desired, a manual operation panel 75 for instances in which use of the monitor 72 and keyboard 74 are not required. A number of switches 76 may also be provided, if desired, to automate different processes of the blood irradiating apparatus 10 of the present invention. These switches may control, for example, the activation or intensity of individual lamps and the flow velocity of the blood through the cuvettes 200, 300.

The laminar-flow cuvette 200 will preferably comprise a generally flat main body 230 having a tapered first end 210 and a tapered second end 220 and enclosing a flow passageway therein as illustrated in FIGS. 3–4. Preferably, a number of pins 235 will be disposed within the laminar-flow cuvette 200 in order to cause a sufficiently turbulent flow of blood through the main body 230 of the laminar-flow cuvette 200. In the preferred embodiment, the pins 235 will be configured to provide a slightly turbulent flow sufficient to optimize exposure of the blood flowing through the laminar-flow cuvette 200 to ultraviolet irradiation. In a most preferred embodiment, the pins 235 will be arranged in a generally staggered configuration as shown in FIG. 3. The laminar-flow cuvette 200 of the present invention will preferably be formed of a substantially strong and translucent material such as, for example, glass or high-density plastic.

In addition to the laminar-flow cuvettes shown, the blood irradiating apparatus 10 of the present invention will include at least one cascade-flow cuvette 300. An exemplary embodiment of the cascade-flow cuvette 300 of the present invention is illustrated in FIGS. 5–8. A front view of the cascade-flow cuvette 300 is illustrated in FIG. 5.

The cascade-flow cuvette 300 of the present invention includes a generally cylindrical housing 305 enclosing a flow passageway therein and having a front side 315 and a rear side 325 as shown. The cascade-flow cuvette 300 preferably includes an inlet 310 disposed near the top end of the housing 305 and an outlet 312 disposed near the bottom end of the housing 305 as shown. A number of steps 320 are preferably disposed within the cascade-flow cuvette 300 in order to cause a sufficiently turbulent flow of blood. In the preferred embodiment, the smallest sized step 320 will be located near the top end of the housing 305 of the cuvette 300 with the size of the steps 320 gradually increasing towards the bottom end of the cuvette 300 as best illustrated in the cross-sectional view of FIG. 6 taken along line 6—6 of FIG. 5.

The stepped configuration of the cascade-flow cuvette 300 of the present invention assists in optimizing exposure of the blood to ultraviolet irradiation during treatment. As shown in the figures, the steps 320 of the cascade-flow cuvette 300 of the present invention will be configured with a number of apertures 330 disposed therein. The apertures 330 in the steps 320 of the cascade-flow cuvette 300 will permit a quantity of blood to flow from a higher step 320 to a lower

6

step 320 of the cascade-flow cuvette 300 providing a sufficient degree of turbulence to optimize exposure of the blood to ultraviolet irradiation as previously discussed.

The cascade-flow cuvette 300 of the present invention is shown in perspective view in FIG. 7. An exploded perspective view is depicted in FIG. 8 and shows several components of the cascade-flow cuvette 300 before assembly. It will be appreciated, of course, by those skilled in the art that a variety of different structural configurations may be utilized for the cascade-flow cuvette 300 without departing from the present invention. Along these lines, as shown in FIG. 8, the front side 315 of the cascade-flow cuvette 300 of the present invention may be comprised of a variety of different components. In a most preferred embodiment, the front 315 of the cascade-flow cuvette 300 preferably includes a first sealing ring 348, a transparent cover 346, a second sealing ring 344, and a threaded outer ring 344. The threaded outer ring 344 may be configured, if desired, with a number of tabs 342 disposed thereon to facilitate easier installation and removal of the cover 346 on the cascade-flow cuvette. Removal of the cover 346 may be desired, for example, in order to clean or disinfect the cascade-flow cuvette 300. Of course, if desired, the cascade-flow cuvette 300 may also be configured to be disposable after a single use so as to substantially reduce the risk of contamination of blood between irradiation treatments.

Since many modifications, variations, and changes in detail can be made to the described preferred embodiments of the invention, it is intended that all matters in the foregoing description and shown in the accompanying drawings be interpreted as illustrative and not in a limiting sense. Thus, the scope of the invention should be determined by the appended claims and their legal equivalence.

I claim:

1. A blood irradiating apparatus for treating blood with ultraviolet light comprising:

a plurality of irradiating chambers, each of said plurality of irradiating chambers including a base and an openable cover to provide access therein,

a plurality of ultraviolet light bulbs disposed within each of said irradiating chambers, said ultraviolet light bulbs configured to provide a wide spectrum of ultraviolet light of differing wavelengths,

at least one laminar-flow cuvette and at least one cascade-flow cuvette disposed within said irradiating chambers and permeable to ultraviolet light from said ultraviolet light bulbs, said laminar-flow cuvette and said cascade-flow cuvette configured to permit blood to flow therethrough in a turbulent manner sufficient to maximize exposure of said blood to said ultraviolet light, and

an adaptable tubing structure configured to strategically transport said blood through said laminar-flow cuvette and said cascade-flow cuvette for exposure to said ultraviolet light during treatment.

2. A blood irradiating apparatus for treating blood with ultraviolet light as recited in claim 1, wherein said laminar-flow cuvette provides a turbulent flow passageway for blood during treatment and comprises:

a generally flat main body having a tapered first end and a tapered second end and enclosing a flow passageway therein,

said generally flat main body having a plurality of pins disposed therein to provide for turbulent blood flow during treatment.

3. A blood irradiating apparatus for treating blood with ultraviolet light as recited in claim 2, wherein said cascade-

# EXHIBIT C

## ACTO DE CESION DE DERECHOS, CREDITOS Y ACCIONES,

ENTRE:

De una parte el señor GEORGE EINSTEIN, quien es ciudadano norteamericano mayor de edad, portador del pasaporte norteamericano número 201817003, domiciliado y residente en la ciudad de Woodlands, estado de Texas, de los Estados Unidos de Norteamérica y accidentalmente en esta ciudad de Santo Domingo, Distrito Nacional, quien en lo que sigue de este acto de cesión de crédito, derechos y acciones se denominará EL CEDENTE y de la otra parte, la sociedad comercial INVERSIONES FLOR DE INVIERNO S. A., compañía establecida y organizada bajo los lineamientos de las leyes de la República Dominicana, debidamente, con su domicilio social y principal establecimiento ubicado en la avenida Sarasota, esquina calle Francisco Moreno, Plaza Kury, suite 302, en esta ciudad de Santo Domingo, Distrito Nacional; debidamente representada para los fines y consecuencias de la presente Cesión de Crédito y Derechos, por su Presidente, el señor RENATO MORLA, quien es dominicano, mayor de edad, comerciante, portador de la cédula de identidad y electoral número 001-1096611-6 domiciliado y residente en esta ciudad de Santo Domingo, Distrito Nacional; quien en lo que sigue de este acto se denominará EL CESIONARIO.

## PREÁMBULO

RESULTA: A que entre los año 2000 y 2001 el CEDENTE señor GEORGE EINSTEIN quien es un científico e inventor reconocido, a instancia e iniciativa del Sr. WILLIAM SISKIND a quien conoció en los Estados Unidos, fue invitado por este a participar en una sociedad con fines de negocios en la República Dominicana, la cual fue creada por este último en el año 2001 y a la que denominó "Einstein Clinical



Labs," con el fin de realizar investigaciones y ofrecer tratamiento a personas afectadas con el HIV y la hepatitis;

RESULTA: Que el CEDENTE independientemente de tener una participación societaria mayoritario en el proyecto de marras, aportaba al mismo, sus conocimientos y prestigio mundial en calidad de empleado asalariado de la empresa, además de el desarrollo e implementación de un invento de su autoría denominado "MATRIZ" basado en tecnología de radiación de rayos ultravioletas, el cual estaba en etapa de perfeccionamiento y el cual podría eventualmente servir para tratar y curar algunas enfermedades.

RESULTA: Que es interés de GEORGE EINSTEIN de ceder y transferir la totalidad de los derechos accionarios que le corresponden dentro de la compañía "Einstein Clinical Labs" y sus derechos como autor del denominado invento de su autoría denominado "Matriz" a la Cia. Inversiones Flor de Invierno S.A.

POR TANTO: y en el entendido de que el preámbulo precedente forma parte integral del presente acuerdo, las partes,

HAN CONVENIDO Y PACTADO LO SIGUIENTE:

PRIMERO: EL CEDENTE, SEÑOR GEORGE EINSTEIN, por medio del presente acto CEDE Y TRANSFIERE, con todas las garantías de derecho, desde ahora y para siempre, a favor del CESIONARIO LA COMPAÑÍA INVERSIONES FLOR DE INVIERNO S. A., la totalidad de las acciones que posee en la Compañía Einstein Clinical Labs. S. A, y con dichas acciones las prerrogativas y derechos que le otorgan los estatutos sociales a los accionistas de dicha compañía.-

SEGUNDO: Por este mismo acto el CEDENTE, SEÑOR GEORGE EINSTEIN, cede también en las mismas condiciones consagrada en el artículo que antecéde, al CESIONARIO LA COMPAÑÍA INVERSIONES FLOR DE INVIERNO G. A. la totalidad de los derechos que le corresponden como autor del invento denominado "Matriz".

TERCERO: Como compensación a la presente cesión de derechos LA CESIONARIA LA COMPAÑÍA INVERSIONES FLOR DE INVIERNO S. A. acuerda pagar al CEDENTE SEÑOR GEORGE EINSTEIN, la suma y derechos siguientes: a) U\$ (US\$30,000.00) TREINTA MIL DOLARES NORTEMAERICANOS que este último declara haber recibido libre y voluntariamente y a su entera satisfacción de manos de EL CESIONARIO, por lo cual el presente contrato, sirve como recibo de descargo y finiquito por la suma antes señalada; y b) además otorgará el porcentaje de un cincuenta por ciento (50%) de los beneficios que pudieran devengarse en el futuro de los derechos cedidos del invento denominado "Matriz"

CUARTO: Las partes acuerdan que el CESIONARIO podrá reclamar en su propio nombre las indemnizaciones y daños perjuicios que resultaren de las reclamaciones a incoar, por el lucro-cesante, el daño emergen entre otros.

QUINTO: LAS PARTES ACUERDAN, que a partir de la notificación a los deudores de la presente CESIÓN DE DERECHOS, todos los pagos que efectuare este último, deberá hacerlo directamente al CESIONARIO, por efecto de la presente cesión de crédito y subrogación de derechos.

SEXTO: EL CEDENTE por medio del presente contrato, subroga al cesionario en los derechos que le asisten como beneficiario de los derechos antes descrito,

otorgándole poderes amplios y suficientes como en derecho fueren necesarios para la reclamación de los mismo.

SEPTIMO: Para lo no previsto en el presente CONTRATO DE CESION DE DERECHOS, las partes se remiten al derecho común.

HECHO Y FIRMADO, en dos originales, uno para cada uno de las partes contratantes, en santo domingo, Distrito Nacional, capital de la República Dominicana, a los veinte y nueve (29) días del mes de Mayo del año Dos Mil Siete (2007).

GEORGE EINSTEIN
CEDENTE

RENATO MORLA
PRESIDENTE DE INVERSIONES FLOR DE INVIERNO S. A.
CESIONARIO

Yo, DR. FRANCISCO A. CAMPOS VILLALON, Abogado Notario Público, matriculado ante el Colegio de Notarios de la República Dominicana con el número 1787, CERTIFICO Y DOY FE, que por ante mí comparecieron libre y voluntariamente los señores GEORGE EINSTEIN y RENATO MORLA, quienes me manifestaron bajo la fe del juramento que de esa forma es que acostumbran a firmar dar validez a todos los actos de sus vidas públicas y privada. En la ciudad de Santo Domingo, Capital de la República Dominicana a los veinte y nueve (29) días del mes de Mayo del año Dos Mil Siete (2007).

FRANCISCO A. CAMPOS VILLALON
Notario Público
Distrito Nacional

# EXHIBIT D

## TRANFER OF RIGHTS AND SHARES AGREEMENT

BETWEEN:

ONE PARTY MR. GEORGE EINSTEN WHO IS AN AMERICAN CITIZEN AND
OVER 18 YEARS OF AGE AND HOLDER OF AN AMERICAN PASSPORT
NUMBER 201817003 WHO RESIDES IN THE CITY OF WOODLANDS, STATE OF
TEXAS OF THE UNITED STATES OF AMERICA  WHO EXECUTED A TRANSFER
OF RIGHTS AND SHARES IN THIS CITY OF SANTO DOMINGO TO " FLOR DE
INVIERNO"  INVESTMENT  GROUP  A  COMPANY  ORGANIZED  AND
ESTABLISHED UNDER THE GUIDELINES AND LAWS OF THE DOMINICAN
REPUBLIC, UNDER THEIR LEGAL ADDRESS AND PRIMARY LOCATION
SITUATED AT: SARASOTA AVENUE IN THE CORNER OF FRANSISCO
MORENO STREET, PLAZA KURY SUITE 302 IN THE CITY OF SANTO
DOMINGO AND REPRESENTED BY ITS PRESIDENT MR. RENATO MORLA,
WHO HOLDS A CITIZENSHIP FROM SANTO DOMINGO AND IS OVER 18
YEARS OF AGE WITH AN ID NUMBER 001-1096611-6 AND RESIDING IN THE
CITY OF SANTO DOMINGO.

### RESULT

RESULTING: IN THE YEAR OF 2000 AND 2001 MR. GEORGE EINSTEIN WHO IS
WELL KNOWN AS A SCIENTIFIC INVENTOR BY INITIATIVE OF MR. WILLIAM
SISKIND WHO HE MET IN THE UNITED STATES WAS INVITED TO
PARTICIPATE IN A PARTNERSHIP IN THE DOMINICAN REPUBLIC WHICH
WAS CREATED BY MR. EINSTEIN IN THE YEAR 2001 UNDER THE NAME OF
"EINSTEIN CLINICAL LABS WITH THE ONLY PURPOSE OF DEVELOPING AND
RESEARCH AND ALSO OFFERING TREATMENT TO PEOPLE AFFECTED BY
AIDS "HIV" AND ALSO HEPATITIS.

AGREED

THAT MR. EINSTEIN BESIDES BEING THE LARGEST SHAREHOLDER OF THE
COMPANY WILL ALSO CONTRIBUTE ALL HIS KNOWLEDGE AND PRESTIGE
AND ALSO WILL PARTICIPATE AS A SALARIED EMPLOYEE AND MOST
IMPORTANT IMPLEMENT HIS INVENTION WHICH HE CALLS "THE MATRIZ"
WHICH IS BASED ON THE TECHNOLOGY OF ULTRAVIOLET RAYS AND
RADIATION IN WHICH AT THE TIME OF THE PARTNERSHIP WAS IN THE
PROCESS OF TESTING AND PERFECTING IT, THIS WILL EVENTUALLY WILL
BE USED IN THE CURE OF SOME DISEASES.

AGREED

THAT MR. GEORGE EINSTEIN WILL TRANSFER IN ALL ITS TOTALITY ALL
THE LEGAL RIGHTS AND SHARES OF THE COMPANY NAMED "CLINICAL
LABS" TO THE "FLOR DE INVIERNO"INVESTMENT GROUP INCLUDING THE
ALREADY MENTIONED INVENTION "THE MATRIZ"

BY MEANS OF ALL INTEGRITY BY BOTH PARIES

THE FOLLOWING HAS BEING EXECUTED

FIRST: MR. EINSTEIN BY THIS DOCUMENT TRANSFERRED ALL RIGHTS AND SHARES OF THE COMPANY "EINSTEIN CLINICAL LABS" TO: "FLOR DE INVIERNO" INVESTMENT GROUP.

SECOND: BY THIS SAME DOCUMENT MR. EINSTEIN ALSO TRANSFERED ALL THE LEGAL RIGHTS OF THE "MATRIZ" TO "FLOR DE INVIERNO" INVESTMENT GROUP.

THIRD: AS A COMPENSATION FOR THE TRANSFER OF RIGHTS AND OWNERSHIP, THE FOLLOWING COMPANY: "FLOR DE INVIERNO" INVESMENT GROUP" HAS AGREED TO PAY MR. EINSTEIN THE AMOUNT OF $30,000 US DOLLARS IN WHICH HE RECEIVED VOLUNTARILY AND SATISFIED USING THIS DOCUMENT AS A RECEIPT, HE WILL ALSO RECEIVE 50% OF THE BENEFITS AND PROFITS THAT MAY OCCUR IN THE FUTURE BY MEANS OR RELATED TO THE INVENTION " THE MATRIZ".

AGREED

BOTH PARTIES AGREED THAT MR. EINSTEIN ON HIS OWN COULD CLAIM ANY IMDENIFICATION OR DAMAGES THAT MAY OCCUR IN THE PARTICIPATION AND PROFIT OF OTHER PARTIES THAT MAY BE INVOLVED.

FIFTH:  BOTH PARTIES AGREE THAT FROM THIS MOMENT OF NOTIFICATION TO ALL CREDITORS AND DEBTORS ALL PAYMENTS AND NOTIFICATIONS WILL BE MADE DIRECTLY TO THE NEW HOLDER.

SIXTH:  BY THIS DOCUMENT MR, GEORGE EINSTEIN RESIGNED IN HIS TOTALITY TO ALL EXISTING RIGHTS TO THE NEW SUCCESOR.

SEVENTH:  BY ALL RIGHTS AND GUIDELINES THIS DOCUMENT WAS SIGNED IN TWO ORIGINAL DODUMENTS, ONE FOR EACH PARTY, IN THE DOMINICAN REPUBLIC IN THE 29TH DAY OF MAY OF 2007.

# EXHIBIT E

LAW OFFICE
## Jeffrey M. Siskind, Esquire
*PRIVATE PRACTICE DIVISION OF SISKIND LEGAL SERVICES, L.L.C.*
Florida - Maryland - New Mexico - District of Columbia - U.S. Virgin Islands
Trump Plaza Professional Building   525 South Flagler Drive, Suite 200   West Palm Beach, Florida 33401
Telephone  (561) 832-7720    Facsimile  (561) 832-7668   E-mail: jeffsiskind@msn.com

July 9, 2007

Board of Directors of Einstein Clinical Laboratories, SA
Attn: William L. Siskind, Director
One North Charles Street, Suite 2310
Baltimore, Md 21201

Re:  **Jeffrey M. Siskind Demand Upon**
     **Einstein Clinical Laboratories, SA (the "Corporation")**
     **to Initiate Action**

Dear Mr. Siskind:

The undersigned is the owner and holder of shares of stock in the Corporation and am the owner and holder at all times mentioned herein.

In accordance with F.S.A. § 607.07401, I am hereby making a demand upon the Board of Directors of the Corporation to initiate a lawsuit against George Einstein for the acts complained of herein that are as follows.

1.    On November 22, 2001, Mr. Einstein executed an Assignment Agreement in which he sold, assigned, and transferred all his rights in the blood irradiation apparatus and associated intellectual property rights to the Corporation.

2.    On October 4, 2005, the United States Patent Office issued a patent number 6,951,548 B1 in the name of the Corporation.

3.    Also in the Assignment Agreement, Mr. Einstein agreed to purchase 350,000 shares of stock of the Corporation at a purchase price of $2.50 per share for a total purchase price of $875,000. The Assignment Agreement assigned a value of the intellectual property rights transferred at $450,000 which was credited to Mr. Einstein's stock purchase thereby leaving a balance due the Corporation of $415,000. As of the date of this letter, Mr. Einstein still owes the Corporation this sum.

4.    On May 29, 2007, Mr. Einstein entered into a transfer agreement with an entity called Inversiones Flor De Invierno SA ("Inversiones"), in which Mr. Einstein transferred the intellectual property that belongs to the Corporation for the sum of $30,000 plus 50% of the profits to be derived from the intellectual property. He did this in spite of the Assignment Agreement and in spite of the validly issued patent.

July 9, 2007
Board of Directors of Einstein Clinical Laboratories, SA
Attn: William L. Siskind, Director
Pg. 2


5.      The sale of the Corporation's intellectual property rights and patent constitutes the majority of the Corporation's assets and without action will preclude the Corporation from continuing in business.

6.      Based upon the above, Mr. Einstein has breached his fiduciary duties to the Corporation and to the Corporation's shareholders. Moreover, Mr. Einstein owes the Corporation $415,000 that the Corporation requires for general working capital purposes.

I am therefore making a demand upon the Board of Directors to initiate an action against Mr. Einstein.

Should the Board of Directors fail to initiate an action against Mr. Einstein within the time frames required by applicable law, I will initiate a derivative action on behalf of the Corporation against Mr. Einstein.

Yours very truly,

Jeffrey M. Siskind

**◥JS 44** (Rev. 11/05)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.) **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

## I. (a) PLAINTIFFS

JEFFREY M. SISKIND et al.

## DEFENDANTS

STEPHEN VINCENT et al.

**(b)** County of Residence of First Listed Plaintiff **PALM BEACH**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant **BROWARD**
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

CIV-HURLEY

HOPKINS

Attorneys (If Known)

**07-61131**

**(d)** Check County Where Action Arose: ☐ MIAMI-DADE ☐ MONROE ☒ BROWARD ☐ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

*0.07CV 61131-Hurley-Hopkins*

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | **PERSONAL INJURY** ☐ 362 Personal Injury - Med. Malpractice | | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 365 Personal Injury - Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 320 Assault, Libel & Slander | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 330 Federal Employers' Liability ☐ 368 Asbestos Personal Injury Product Liability | ☐ 650 Airline Regs. | ☒ 830 Patent | ☐ 480 Consumer Credit |
| | ☐ 340 Marine | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 345 Marine Product Liability | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle | **PERSONAL PROPERTY** ☐ 370 Other Fraud | **LABOR** | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Mgmt. Relations | **SOCIAL SECURITY** ☐ 861 HIA (1395ff) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | ☐ 385 Property Damage Product Liability | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) ☐ 864 SSID Title XVI | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

Sent for by ☐ INTAKE

AUG 10 2007

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - FT. LAUD.

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Re-filed- (see VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. RELATED/RE-FILED CASE(S).

(See instructions second page):

a) Re-filed Case ☐ YES ☒ NO    b) Related Cases ☐ YES ☒ NO

JUDGE _____ DOCKET NUMBER _____

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (**Do not cite jurisdictional statutes unless diversity**):

35 USC Sect. 1 et seq.; Patent Infringement and related state law claims

LENGTH OF TRIAL via 4-5 days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD *PLAINTIFF*

DATE 8-9-07

**FOR OFFICE USE ONLY**

AMOUNT 350.00    RECEIPT # 540692    IFP